Good morning, Your Honors. Eric Babcock, appellant, Hyacinth O'Day. All right. For both. Thank you. May it please the Court, I'd like to start with a brief personal story because on the way over here this morning I was cited for making an improper left turn. And the officer pulled me over, wrote the citation, showed it to me, explained what it was for, and I signed it. That's the way it goes some days. Well, ironically, Mr. O'Day was given about $2 million in loans, and to this day no one really knows whether he signed those loan applications. He — there were abundant signatures shown to the jury. There was no expert testimony presented, but — Does there have to be for the jury to make a determination as to whether or not a signature is valid? No, there doesn't. And to the layperson's eye, at least counsel's, some of these signatures appeared to be made by different people. I mean, everyone's signature can vary somewhat, but within a range. Did you — were you defense counsel at trial? I was. And so did you hire an expert to make the distinction among the signatures, the various signatures? No, we did not. But I presented any number of these signatures and various documents that were given to lenders, some of which had — my client's name was simply misspelled. I mean, there were different spellings in my client's name, which in my experience is not something that someone does with their own name. Yeah. But the jury — that's a question for the jury. The jury looks at everything, decides who's credible, who's not credible, what evidence is believable, what evidence is not believable, and makes a ruling. And so now that's the ruling we have. And you're challenging that ruling, right? I am. That decision by the jury. So what in the record should we look to to be convinced that the jury's verdict is not worthy of belief? Well, it's not so much the jury that I'm challenging, Your Honor. It's the judge's decision to let the jury decide the case on a deliberate ignorance theory. Because this was really — this was really all or nothing. If my client signed those loan applications with what I concede was numerous and blatant false information about his income and employment, if he signed those loan applications, he was in on the fraud and he was guilty of it. The whole trial, though, was — the whole defense in the whole trial from our perspective was whether or not he signed those loan applications or whether when he signed those they had that information in them. Because there's no — there's no dispute that all of the communications with the lenders, all of the faxes, the phone calls, the mails, was done by the broker, Andrew Eshabu. So there was some evidence that the government points to that your client got loans, and in fact in one case was told to make mortgage payments in his own name even though the money was being supplied by someone else. So there were certainly some things that the jury could say would have raised a red flag if you were ignorant of any aspect of the transaction. This was all after. What the court had to find to give the deliberate and ignorance instruction was my client was alerted to something that should have made him suspicious before — either when these loan applications or before they were submitted or before the loans closed. What the prosecution is arguing are facts afterwards. But there's no — What was the amount of the loan? So there were two — The first loan. There were two houses, each with two loans, a first and a second. Right. The house that my client lived in on Adriatic Court, the first was, I think, 680,000, 690,000. And what was the combined household income? That was really not proven, Your Honor. There was evidence — What was the evidence at trial? The evidence was that my client had worked at Circuit City until approximately September of 2005. The first of these loans was not — at Circuit City, he made about $30,000, give or take annually. These loans were not applied for until a year later, September 2006. Okay. Was there any evidence that he was employed at that time? There was some testimony that during one of the searches, they found some documents indicating that my client was living in Chicago during 2006 and that some documents that he'd made, I think, around — I don't have the number firmly in mind. I want to say $17,000. That's — I'm not firm on that. What was the second loan? The second loan on that home was, I think, $130,000. And then the loans on the second house, which belonged to his future sister and brother — The loan was in his name, right? The loan was in his name. And how much was that for? Those two loans combined were over $1.1 million. So even if we — and what was the — what was the salary for his spouse or fiancée or whatever the status was? What was the salary? Ms. Anyanwu was a registered nurse and starting or had started a residential care facility at another house that she owned. Income? Well, her income was not disclosed, I don't believe, on — I thought that was — I have a number in my head, $56,000. That may be on loans that she applied for separately. But on the loans that my client was charged with were based on his alleged income and his alleged employment. Okay. So if someone has an income of around, I don't know, $50,000 generously for him and you get a loan for over $1 million, that wouldn't raise a red flag regarding the procedure to acquire the loan? That wouldn't justify deliberate indifference instruction? Not necessarily, I don't think. I mean deliberate ignorance instruction? Not necessarily, but maybe. You don't — If there had been — Would the judge be — would the judge have committed error in giving a deliberate ignorance instruction with those facts? I think the judge did. Why? Why wouldn't that raise a red flag? There was no — there was no testimony. Well, first, the government didn't really prove — even really try to prove what my client's income was for that year. So — or what he was expecting to make in the coming years. So how can they say that he wasn't going to be able to make this mortgage payment? He did make the mortgage payment. He lived in that house for some five years until he was finally remanded in this case. Well, the question is whether he could — not whether he could make the mortgage payment, but whether or not the mortgage would have been even given to him if the correct information had been provided on the — excuse me — on the loan application. That was the question. There's no — I don't have any dispute that the lender said if — if the lender would have said we wouldn't have given this loan if we'd been given lower numbers. But the question is what was — what alerted my client to the fact that he didn't qualify for this loan? What was there — did anyone testify? We showed him this loan application or we told him this was, you know, this was the  Well, it doesn't have to be expressed testimony. It can be inferences from the information that's presented. It doesn't have to be expressed testimony that he was explicitly advised that you need a certain income level to qualify. There could be inferences from the record. So the government says, well, he took a real estate finance course or a real estate course and got a good grade in it. And so there's sort of a common sense. You don't even need a real estate course to know that you have — that a mortgage on a house of a million dollars or more is somewhat high. So the government argues, well, he had enough knowledge to know he wasn't going to get loans on two houses, one close to a million dollars, three-quarters of a million, the other over a million, without having a really substantial salary. So is that enough evidence to justify saying he knew that something was amiss? I don't think so, Your Honor, for starters. And the reason is this course was — it's the modern-day equivalent of what in the old days we would have called a correspondence course. It's online now. And you read some materials and then you go take a multiple-choice test online. And if you get a certain score, then you're qualified to get the license. My client never worked a day in the mortgage industry. He's never — there's no evidence he's ever done a loan, ever owned a home before this. His future brother-in-law, Mr. Ishebu, was a mortgage broker and an experienced mortgage broker and had been doing this for years. He's the one that did all these documents. Certainly he knew, but — But I guess — I mean, the jury rejected that theory, obviously. And so the real question is not whether that is, in fact, true or the jury shouldn't have rejected it or whatever, but whether there was enough evidence that the jury could accept to justify the instruction, right? So you'd have to say there was not even sufficient evidence to justify an instruction, which is a very low standard. Well, it is a low standard, but it's not without some teeth, and there has to be — I think that's how we've characterized it. I mean, there's not — you know, all these — most or if not all these deliberate ignorance cases usually have to do with smuggling, whether it's drugs or unlawful aliens. And the question is — But the principle isn't limited to both contexts, right? No, it's not, right? But the question is — the analogous question is, right, did my client smell something that should have alerted him there was marijuana in the car? Or did my client hear some movement in the trunk of the car that should have alerted him to the fact that there was someone hiding in the back of the car he was about to drive across the border? Or was my client approached by a total stranger and said, I can give you a million-dollar house, all you've got to do is sign here? That's not what happened here. This man, the broker, was his future brother-in-law. He didn't marry Ms. Anyanmu until after these loans, but presumably they knew each other beforehand, though there was no evidence offered by the government on that issue one way or another. But when that — by the way, I assume is why she was not on these loans. They weren't married at the time. They had — their incomes were separate. This was not a stranger on the street telling my client he could get a million-dollar loan. That would be suspicious. This was his future brother-in-law, an experienced mortgage broker, saying, I think you can qualify for this house. I think it will work. I think that's qualitatively different than the kinds of cases where this instruction is not effective. This instruction is typically loud and really what it's appropriate for. All this paperwork, one person cannot say that my client saw it, my client was shown it, discussed it, nothing. The notary in the first transaction was Mr. Shabu, and the notaries in the second home loans, they didn't review the loan applications with my client. There needs to be something, and there just wasn't here. Looking back on it, it looks suspicious. But the question is, was my client subjectively made aware of something that should have made him suspicious? Is that the standard, that your client has to be subjectively aware for a deliberate, ignorance instruction? Absolutely. What case says that the defendant has to be subjectively aware in order for a deliberate, ignorance instruction to ensue? All of them. Give me your strongest. Starting with Juul itself, which is the case, as you know, that first allowed this type of instruction. What's the language that you're relying upon in Juul? Just a second. The whole point of the Juul instruction is that the defendant willfully blinds themself. The language is, if the defendant was not actually aware, his ignorance in that regard was solely and entirely a result of a conscious purpose to avoid learning the truth. The instruction in that case said the accused had to, quote, be aware of facts making the presence of contraband all but certain. So as the district court's instructions was, which follows our language in Heredia, is you must find beyond a reasonable doubt that the defendant was aware of a high probability that fraudulent mortgage loan application. So it doesn't have to know or be subjectively aware that they're fraudulent, but just that there's a high probability. So that's, I think, how we've differentiated the willful blindness or deliberate ignorance instruction. But there has to be something that they're aware of, something suspicious. So your position is that there was no evidence that would support the district court giving an instruction that a person in your client's situation could be aware of a high probability that something fraudulent was afoot. You're saying there was no evidence that would allow the district court to give the instruction. Is that right? Exactly. Okay. I think we understand that. Do you want to make, argue on any other point? No.  All right. You can save the balance of your time for rebuttal if you like. Thank you. All right. Thank you, counsel. We'll hear from the government. May it please the Court. Suzanne Miles for the United States. This Court reviews a district court's decision to give a deliberate ignorance instruction for abuse of discretion. And the facts that were elicited at trial are viewed in the light most favorable to the government. I think that Your Honors have flushed out the facts that support the deliberate ignorance instruction already today. But in summary, what we do know is that Mr. Uday, within the span of two years, obtained two loans for two properties amassing close to $2 million, actually over $2 million. The only evidence that we have of his income is around $36,000 a year, which as defense counsel pointed out, we don't have any evidence in 2006 that he was employed at all. Defense counsel makes the point that the government failed to actually prove up to any certainty the amount of income. Do you agree with that? We don't have any evidence of his income. That's correct. Do you think that helps you, your case, or do you think that hurts your case? Well, I think that the investigation was done and no evidence was found regarding income, and there was testimony to that regard. We also have bank records that indicate that Mr. Uday's bank account at the time that he had the loan totaled $125, even though the loan applications indicate that he had $250,000 in that loan account. So we do have direct evidence that he had very little in terms of assets at that point. The evidence is on the record in that regard. We also know with regard to the Plover Court property that what happened, which that was the Eshagbu's residence, and Mr. Uday essentially acted as a straw buyer in that transaction, bought that residence, grant deeded it back to the Eshagbu's a month later, and then for the next nine months accepted payments from Mr. Eshagbu that he deposited into his bank account and then wrote checks to the lender for a period of nine months to pay for that loan. We have ample evidence on the record indicating, number one, that there was actual knowledge on Mr. Uday's part of this scheme. And if not that, then at least deliberate ignorance. What was the evidence of actual knowledge? The signatures on the loan applications themselves prove actual knowledge. And while those signatures weren't notarized, we did put in notarized exemplars of Mr. Uday's signature, and we have multiple exemplars of his handwriting, which is actually quite distinctive. So, Your Honor, I actually have those listed. The jury was able to compare the loan documents, which are at SCR 959, 964, 922 or, I'm sorry, 1022 and 1027, with the notarized signature exemplars, which were provided at SCR 1082 and 1085. And, in particular, the jury was able to look and compare the handwriting on the dates, the numbers that were used next to Mr. Uday's signature on the loan applications at SCR 965 and 1027 against other exemplars of his handwriting on the checks that I mentioned were written to the lender. And a good example of that is SCR 1264. When you look at those compared next to each other, the jury was able to make a conclusive knowledge that Mr. Uday actually did sign those loan applications. What's your response to opposing counsel's observation that in one of those signatures the name was misspelled, which would lead one to believe that someone else had made the signature? That's not in the signature itself. It's on a typed-out version of Mr. Uday's name on another document that wasn't one of the loan documents. It's other ancillary documents that were put into evidence that were supportive of the actual loan applications. It wasn't on the loan applications themselves. And it's the loan applications that contain the false statements. Unless the Court has any other questions, the government will rest on the briefs. I think that the facts are fully flushed out there. And if the Court has no questions on any of the remaining issues. I do. I have a question on the supplemental instruction. Could you address that briefly? On the 911 supplemental instruction? Certainly. With regard to that instruction, the Court correctly defined the mens rea requirement for a false statement of U.S. citizenship, indicating that the jury could only find someone guilty if they acted willfully. And then the Court also correctly stated the act requirement, which is that a defendant needs to make a clear statement of United States citizenship, that that statement must be false, and that it must be made to someone who has a reason to ask, who is going to rely on it. Well, there was a question about what directly meant in terms of the elements. And so what did the Court instruct regarding that? Well, that's an interesting issue, and it's a little bit confusing, because it kind of plays on different meanings of the word direct. It's important to know that direct actually isn't in the statute. It's a product of this Court's case law. Right. I think the case is Carudi, if I'm pronouncing that correct, or Caroni. And that states that you can't just make a statement that infers U.S. citizenship. You have to make a clear statement that I am a United States citizen. It has to be direct. It has to be direct. Right. And so that was the issue that the jury had. What does it mean for a false statement of citizenship to be direct, right? Yes. And so what did the district court tell the jury about that? The district court said that the phrase directly and falsely in this instruction means that the defendant or another acting with the defendant's knowledge and consent made a clear representation of citizenship that was not true. So it defined direct to be a clear representation of citizenship that was not true. Now, it went on from that and discerned that that really wasn't what the jury was asking. It wasn't asking the Caroni question, whether the statement was, I am a United States citizen. It was really asking whether the defendant had to utter that herself or whether someone could utter that on her behalf. And that's because the document that was checked said specifically there was no question about that, I am a U.S. citizen? That's exactly right. I am a U.S. citizen. And it's different than the case Smiley, which Caroni addressed, in which a box was checked that just said I'm a citizen and then said of where and they wrote New York or something along those lines. And so there was some question about whether that was just inferring United States citizenship or not. Here we don't have that confusion. Exactly. The box was checked that said I am a United States citizen. It meets the direct requirement of Caroni. And the jury was properly instructed on that. Unless the Court has any other questions? Any questions, Judge Huck? No, I don't. Thank you, counsel. Thank you. All right. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the Court. That completes our calendar for the morning. This Court will be in recess until 1.30 p.m. tomorrow afternoon. Thank you. Thank you. Thank you. Do you guys know if I'm going to start right here? Can we listen? Okay. We're going to tell you a little bit more about this amazing courthouse, this amazing courtroom, and a special opportunity for you to speak with the judges and the law clerks. It was arranged by Sean, who is the judge, is it? Uh-huh. Yeah, so. Senator Jennifer here to have you have this chance to both speak with the judges and speak with the law clerks. So, when you speak with the judges, you're going to need to stand up and project your voice, because they're up here, and they're not going to hear you. You've already learned about the beautiful acoustics in this spectacular room. As amazing as the marble is, the sound is terrible. And we do our best with microphones, and it, you know, works the way it works, which is not as great. The inspiration for this room is the Parthenon, as you can tell. And it was built as a trial court courtroom. So, it was designed for a trial. It used to have a jury box right there where the courtroom deputy was sitting today. And one of the things you notice is the courtroom deputy is making a digital audio recording of the oral argument, but there's no court reporter. That's because it's not a trial. There's no evidence. There's no witnesses. There's just three judges and an attorney talking. And I think the other reason for that would be the only appeal from here is up to the U.S. Supreme Court, and we have 14,000 cases a year, and they take 86. So, your odds are that this is the final hearing for most of these cases. So, he's made the digital recordings. Any of you that want to re-listen to the cases tomorrow, they'll be right there on our website. We have cases posted going back to about 2001. And then many of you have probably seen the video recordings of other high-profile cases from our court because we do allow cameras in the courtroom. You see a little tiny camera there, a little tiny camera there. It's basically the same feed that Judge Hudd was watching to see us today from his chambers in Reno, Nevada. So, we have a lot of cases posted there. One of the big ones that took place in this courtroom, in the room of the prostitutes, sat right there in the front row, was the social network case when they challenged the settlement agreement that they had reached in the district court and wanted to continue the litigation. So, the wiggle bike came and marked everyone. And we had a totally packed house for a social network case. And as soon as that one was over, everybody left and there were two lawyers sitting there going, where did everybody go? And the next cases weren't nearly as exciting to the public. So, the judges sit by seniority. Judge Rollinson was residing, so she was in the middle. Then was Judge Acuda next to her because she arrived on the court later. And then Judge Hudd is a senior judge, which means that he's retired, but continues to take cases because we have such a backlog and because he loves the work. So, he continues to work with us, for which we're very grateful. And then Jim is the tech. He actually kept us linked up to him, which is never an easy task. So, you can imagine, we have enormous computer servers down in the basement that link up all the judges in the Ninth Circuit from here to Alaska, out to Hawaii, to Montana, and Arizona. Every case is administered from this courthouse, so we have all the records of the cases and all the materials of the cases here. But when a case is sent to oral argument, everything is shipped out to these guys and to the judges' chambers, and the law clerks then take care of the cases in that way. So, these guys can tell you a little bit about when they got these cases, when they started, what their everyday life is like, whatever else you want to talk about. They're interested in everything.
judges: Hug, Rawlinson, Ikuta